FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANH TUYET THAI; DON DOAN;
TOMMY NGUYEN, on behalf of
themselves and all others similarly
situated,

    *Plaintiffs-Appellants*,

 and

MOHAMMAD NASSIRI; DIEP THI
NGUYEN; ANH VAN THAI; DUC
HUYNH; TRAI CHAU; LANH
NGUYEN; HOI CUU QUAN NHAN
VIET NAM CONG HOA; THO VAN
HA,

    *Plaintiffs*,

 v.

COUNTY OF LOS ANGELES;
WILLIAM VILLASENOR; DULCE
SANCHEZ,

    *Defendants-Appellees*,

 and

Nos. 23-55326
   23-55327

D.C. No.
3:15-cv-00583-
WQH-NLS

OPINION

STATE AND/OR LOCAL AGENTS
LADA; DOES, 1-10,

*Defendants.*

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted September 10, 2024
Pasadena, California

Filed February 12, 2025

Before:  Sandra S. Ikuta and Michelle T. Friedland, Circuit
Judges, and Wesley L. Hsu,[*] District Judge.

Opinion by Judge Ikuta

## SUMMARY[**]

### Civil Rights

Affirming the district court's summary judgment for two
law enforcement officers from the Los Angeles District

---

[*] The Honorable Wesley L. Hsu, United States District Judge for the
Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Attorney's Office, who had been assigned full time to a joint federal-state task force to investigate allegations of fraud in Social Security disability benefits applications, the panel held that the officers were acting under the color of federal rather than state law for purposes of 42 U.S.C. § 1983.

Plaintiffs, Vietnamese refugees and residents of San Diego County, alleged that the officers violated their constitutional rights by forcibly entering their homes and interrogating them about their disability benefits. Plaintiffs' complaint focused on claims brought under 42 U.S.C. § 1983, which authorizes injured parties to seek damages against persons who violate their constitutional rights under color of state law.

The panel held that because the federal government was the source of authority under which the task force, the Cooperative Disability Investigations (CDI) Unit, was implemented and because the officers' day-to-day work was supervised by a federal officer, the officers were acting under color of federal, rather than state, law. Although the officers continued to receive their paychecks from Los Angeles County while they were assigned to the CDI Unit, the Social Security Administration reimbursed Los Angeles County for their salaries and overtime. The investigations took place in San Diego, outside of Los Angeles County, indicating that the officers were not drawing on their authority as Los Angeles District Attorney's Office investigators. Finally, the federal nature of the CDI Unit is consistent with many other law enforcement programs that involve both state and federal employees whose officers have been held not liable to suit under § 1983. Plaintiffs provided no evidence that the authority of the state was exerted in enforcing the law such that the officers' conduct was fairly attributable to the state.

**COUNSEL**

Alexandra T. Manbeck, Law Office of Alexandra T. Manbeck, San Diego, California; John F. Hector, Law Offices of John F. Hector, San Diego, California; Quan M. Chau, Orange, California; for Plaintiffs-Appellants.

James C. Jardin (argued), Collins & Collins LLP, Orange, California; Tomas A. Guterres, Collins & Collins LLP, Pasadena, California; Megan K. Lieber, Collins & Collins LLP, Walnut Creek, California; Christie B. Swiss, Collins & Collins LLP, Carlsbad, California; for Defendants-Appellees.

**OPINION**

IKUTA, Circuit Judge:

We consider whether two law enforcement officers from the Los Angeles District Attorney's Office, who were assigned full time to a joint federal-state task force investigating allegations of fraud in Social Security disability benefits applications, were acting under color of state law for purposes of 42 U.S.C. § 1983. Because the federal government was the source of authority under which the task force was implemented and because the officers' day-to-day work was supervised by a federal officer, we conclude the officers were acting under color of federal, rather than state, law.

I

Anh Thai and Don Doan[1] brought 14 claims against two law enforcement officers, Dulce Sanchez and William Villasenor, primarily on the ground that the officers' investigations of their applications for disability benefits violated their constitutional rights.[2]

Sanchez and Villasenor are Los Angeles District Attorney's Office investigators who were temporarily assigned to work full time in a joint federal-state program, the Cooperative Disability Investigations (CDI) Unit, under the supervision of federal Special Agent Glenn Roberts.

Thai and Doan are Vietnamese refugees and residents of San Diego County who applied for disability benefits under Title II and Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 401–434 (Title II); 42 U.S.C. §§ 1381–1383f (Title XVI). Thai applied for reconsideration of her initial claim for disability benefits. Doan filed an initial claim for disability benefits.

In January 2014, Special Agent Roberts instructed Sanchez and Villasenor to investigate several Social Security applicants in San Diego who were suspected of malingering. Thai's case had been referred to the CDI Unit by the Social Security Administration (SSA) Kearny Mesa District Office in San Diego. On January 17, 2014, Sanchez and Villasenor interviewed Thai, who, according to Sanchez, "claimed she could not speak or understand English, but her cousin who was present at the residence was able to translate

---

[1] Because plaintiffs have represented that Tommy Nguyen does not wish to proceed on appeal, we do not consider his claims here.

[2] Plaintiffs brought civil rights claims under 42 U.S.C. §§ 1983, 1985, 1986 and 1988, as well as state law claims.

between English and Vietnamese." According to Sanchez, Thai communicated through her cousin that she understood why Sanchez and Villasenor were there and invited them into her home for the interview. Thai's cousin, who was present for the investigation, disputes this account, and testified that the officers entered the home without consent and intimidated Thai by wearing visible firearms.

Doan's case was referred to the CDI Unit by the California Department of Social Services, Disability Determination Service Division in San Diego. Sanchez testified that when she and Villasenor interviewed Doan on January 22, 2014, Doan said he could speak English, did not need an interpreter, and invited Sanchez and Villasenor into his home for the interview. Doan disputes that account, stating that the officers knocked on his door, exposed their firearms, and then walked into his home and questioned him without obtaining consent.

Both Thai and Doan contend that during the investigations, the officers displayed guns and state badges, did not seek consent for the search, and failed to have an interpreter present. After the interviews, Thai's application for disability benefits was denied. Doan cancelled his application.

On March 14, 2015, Thai and Doan filed suit and brought a variety of state and federal claims against the County of Los Angeles, Sanchez, and Villasenor, based on allegations that Sanchez and Villasenor forcibly entered their homes and interrogated them about their disability benefits. Thai and Doan's complaint focused on claims brought under 42 U.S.C. § 1983, which authorizes injured parties to seek

damages against persons who violate their constitutional rights "under color" of state law.[3]

Sanchez and Villasenor argued that their work in the CDI Unit was not under color of state law, and therefore they could not be held liable under § 1983. The district court agreed and granted their motion for summary judgment.

On appeal, Thai and Doan contend that the district court erred in holding that Sanchez's and Villasenor's activities as part of the CDI Unit were not under color of state law. We have appellate jurisdiction over the district court's final judgment. 28 U.S.C. § 1291. We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact. *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 988–90 (9th Cir. 2016) (en banc) (per curiam).

---

[3] Section 1983 states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. We address Thai and Doan's appeal of the district court's § 1983 ruling as to the claims against Sanchez and Villasenor here, and we address the district court's rulings on Thai and Doan's other claims in a memorandum disposition filed concurrently with this opinion. *Thai v. County of Los Angeles*, — Fed. App'x — (9th Cir. 2025).

II

In determining whether Sanchez and Villasenor were acting under color of state law, we first consider the nature of the CDI Unit to which they were assigned. Implementation of federal SSA disability programs involves coordination by federal and state agencies. The SSA sets the guidelines for disability determinations and oversees the implementation of the Social Security Act, 42 U.S.C. ch. 7, including by overseeing state actors who assist in implementing the Act. *See* 42 U.S.C. ch. 7; 42 U.S.C. § 421(a)(2) (explaining that disability determinations made by a state agency are made in accordance with federal guidelines); 20 C.F.R. § 404.1503 ("State agencies make disability and blindness determinations for the Commissioner [of the SSA] for most persons living in the State."); *id.* § 416.903 (describing the same for supplemental disability determinations); *id.* § 416.1013 ("A determination of disability made by the State is the determination of the Commissioner, except [when the SSA disagrees upon review]"); *see also id.* §§ 404.1620, 416.1015, 416.1033.

Under these federal guidelines, a state agency, known as a disability determination service (DDS), makes the determination whether an individual has a qualifying disability for purposes of the federal SSA. 42 U.S.C. § 421(a)(1), (j)(1). A "DDS acts under the authority and control of the [Commissioner of the SSA]." *Schoolcraft v. Sullivan*, 971 F.2d 81, 83 (8th Cir. 1992) (citing 42 U.S.C. §§ 421(a), 421(k)(1), 1383b(a) (1988); 20 C.F.R. §§ 404.1503(a), 416.903(a) (1991)); *see also* Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, § 107(a)(1), 108 Stat. 1464, 1477 (1994) (substituting Secretary for Commissioner). The SSA Regional Commissioner of each regional office plays a

central role in facilitating the relationship with a state DDS. *See, e.g.*, 20 C.F.R. § 416.1041(d).

The CDI Unit is one part of the disability determination process. The SSA and the federal Office of the Inspector General (OIG), a stand-alone component of the SSA, jointly establish a CDI Unit "in conjunction with state agencies to pool resources[, and] to prevent and detect SSA disability program fraud." *Thai v. County of Los Angeles*, No. 15-cv-583-WQH, 2023 WL 2876940, at *4 (S.D. Cal. Mar. 22, 2023). A CDI Unit combats fraud within SSA disability programs by reviewing questionable disability claims and investigating cases of suspected disability fraud. As of 2021, there were 46 CDI Units covering 37 states, the District of Columbia, and Puerto Rico. Each CDI Unit consists of an OIG special agent who serves as a team leader and personnel from the SSA, the pertinent state DDS, and state or local law enforcement partners.

Cases assigned to a CDI Unit generally begin with a report of suspected fraud from one of several sources, such as the SSA, a state DDS, law enforcement, or the public. The referrals are then reviewed by the OIG special agent before being accepted as a CDI case. If the OIG special agent opens a CDI case, it is referred to the law enforcement members of the CDI Unit to investigate the allegations. When the investigation is complete, the CDI Unit sends a report to the state DDS. CDI Unit personnel are not permitted to opine or make recommendations about an individual's eligibility. DDS staff members decide whether an individual is eligible to receive monthly federal disability benefit payments. Throughout the process, all records are maintained in an electronic investigative case management system controlled by the OIG.

During the period at issue in this case, the CDI Unit in Los Angeles was created by a 2010 Memorandum of Understanding for Cooperative Disability Investigations (MOU) among the California DDS, the SSA San Francisco Regional Office, and the OIG.  According to the MOU, the legal authority to establish the CDI Unit was 42 U.S.C. § 902(a), which sets forth the authority of the Commissioner of the SSA.  Among other requirements, the MOU provided that the CDI Unit's Los Angeles office would be staffed by SSA and California state employees and supervised by OIG Special Agent Glenn Roberts.  The MOU explained that "[t]he OIG Special Agent assigned to the CDI Unit will serve as the CDI Unit's Team Leader" and "will be the CDI Unit's final decision-making authority regarding day-to-day CDI Unit operations, subject to OIG management oversight."

In addition, the OIG was responsible for retaining "additional investigative support as needed," which included assistance from state or local law enforcement investigators. The OIG was also responsible for providing training, communicating with the participating organizations, and ensuring that the CDI Unit's team members understood the prohibition against providing opinions concerning disability eligibility.  Each participating agency agreed "to dedicate these CDI Unit staff for the duration of [the] MOU and to devote 100 percent of the CDI Unit staff's time to providing support for the CDI Unit's investigations."

Pursuant to the MOU, the SSA contracted directly with Los Angeles County to obtain additional investigators with law enforcement authority.  Los Angeles County provided Sanchez and Villasenor to the SSA to perform investigative services.  Sanchez and Villasenor were both Los Angeles District Attorney's Office investigators when they were assigned to the CDI Unit full time in 2013 and 2014.  During

their assignment to the CDI Unit, they were supervised by Special Agent Roberts. As their immediate supervisor, Roberts provided training and assigned cases to the agents for investigation. As members of the CDI Unit, Sanchez and Villasenor were required to follow both SSA policies and procedures, including those set forth in the OIG Special Agent Handbook, as well as their local department policies. Sanchez and Villasenor testified that the CDI Unit required them to use SSA identification credentials when investigating a case. At the end of each investigation, they were required to write reports for the OIG.

In sum, the CDI Unit in Los Angeles was created by the OIG, the SSA Regional Office, and the California DDS and led by a federal special agent. In addition to federal personnel, it included state personnel from the DDS and state or local law enforcement officers, including Sanchez and Villasenor.

## III

We next turn to the legal standard for determining whether activities conducted by state officers as part of the CDI Unit are under color of state law. In the past, we have considered whether a federal officer's conduct is under color of state law. *See Cabrera v. Martin*, 973 F.2d 735, 744 (9th Cir. 1992); *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257 (9th Cir. 2008). In that situation, the "touchstone of [the] analysis," *Cabrera*, 973 F.2d at 744, is "whether there is a sufficiently close nexus between the State and the challenged action of the federal actors so that the action of the latter may be fairly treated as that of the State itself." *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). We have not yet squarely addressed when state officers are acting under color of federal law, but must

determine here whether Sanchez's and Villasenor's activities pursuant to the CDI Unit are fairly attributable to the state. If the officers were not acting under color of state law, then § 1983 cannot apply, and we need not reach the constitutional questions in the § 1983 claims. *Id.*

Our sister circuits have cautioned that "[t]here is no set formula for determining" whether individuals in a joint federal-state program acted under color of state law. *Johnson v. Orr*, 780 F.2d 386, 390 (3d Cir. 1986). Rather, "[a]ll of the circumstances must be examined to consider whether the actions complained of were sufficiently linked to the state." *Id.*; *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976) (considering "the totality of the circumstances" to determine whether local police department employees assigned to a federal agency were acting under color of state law).

As part of that inquiry into whether individuals in a joint federal-state program are acting under color of state law for purposes of § 1983, courts have considered the source of authority under which the challenged conduct took place. *See Askew*, 548 F.2d at 677–78; *Yassin v. Weyker*, 39 F.4th 1086, 1088–90 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 779 (2023). The relevant inquiry for the "color of state law" requirement "focuses not on whose law is being implemented, but rather on whether the authority of the state was exerted in enforcing the law." *Tongol v. Usery*, 601 F.2d 1091, 1097 (9th Cir. 1979); *Paeste v. Gov't of Guam*, 798 F.3d 1228, 1239–40 (9th Cir. 2015) (quoting same). "[T]he nature and character of a cooperative federal-state program is determined by the source and implementation of authority for the program, not for the particular work that the agency chooses, in the exercise of its authority, to perform on a given day." *King v. United States*, 917 F.3d 409, 433

(6th Cir. 2019) (emphasis omitted), *rev'd on other grounds sub nom. Brownback v. King*, 592 U.S. 209, 214 (2021). If the impetus for and execution of the program derives from federal law, then it is under color of federal law, regardless whether the officers are state employees. *See id* at 433–34.

Courts also consider the extent to which "the state was involved in authorizing or administering the task force" as opposed to whether the federal government was primarily responsible for "manag[ing] the operation with the benefit of state resources." *Id.* at 433. The identity of the individuals supervising the daily operations of the program and defendants is indicative of such management. *See Orr*, 780 F.2d at 390. "A crucial inquiry is whether day-to-day operations are supervised by the Federal or state government." *Id.* (cleaned up); *cf. United States v. Orleans*, 425 U.S. 807, 815 (1976) (considering whether employees are federal for the purposes of the Federal Tort Claims Act context and reasoning that "the question here is not whether the [relevant] agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.").

The Seventh Circuit's consideration of those principles in the leading case of *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976), is instructive. In that case, local police officers were assigned to work full time for a federal drug enforcement agency and carried out a raid on the plaintiffs' home. *Id.* at 677. The Seventh Circuit concluded that the state officials were acting solely under color of federal law because they were participating in a federal law enforcement initiative to arrest persons suspected of violating federal law, even though they were state employees. *Id.* at 677–78; *see also Jakuttis v. Town of Dracut*, 95 F.4th 22, 29–30 (1st Cir.

2024) (holding that although the defendant was a state trooper at all relevant times, the actions at issue were related to the "performance of his official duties" to the federal Drug Enforcement Administration's Cross Borders Initiative, and so were under color of federal law). Despite facts indicating that the officials in *Askew* "maintained official links with" the local police department, the Seventh Circuit concluded that they were acting under color of federal law because they were provided federal credentials, paid out of federal funds, and were directed by and subject to the immediate control of federal officers. 548 F.2d at 677.

We agree with our sister circuits. To determine whether state officials assigned to a joint federal-state program operate under color of state law, we consider the totality of the circumstances. In general, where the source of authority for the program is federal in nature and the state officials' participation in the challenged conduct is subject to the immediate control of a federal supervisor, those officials act under color of federal law, not under color of state law.

IV

We now apply this framework to Sanchez's and Villasenor's activities and conclude that the source and implementation of the CDI Unit is federal in nature.[4]

---

[4] In reaching this conclusion, we do not address plaintiffs' argument that the investigations in this case were under color of state law because the findings of the investigations had an effect on Thai's and Doan's state benefits. Plaintiffs did not distinctly raise this argument until their noncompliant supplemental briefs to our court, which included documents that were not part of the record before the district court. *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (the court ordinarily will not consider matters that are not "specifically and distinctly argued in an appellant's opening brief"). We

First, the CDI Unit is implemented under federal law. The impetus for the CDI Unit is to "combat[] fraud within Social Security disability programs" and its role is to "investigate allegations of fraud in SSA's disability programs for purposes of criminal prosecution and/or civil/administrative action." As noted above, the MOU states that the legal authority for the agreement is 42 U.S.C. § 902(a), which sets forth the SSA Commissioner's authority. In other words, the CDI Unit is created under federal authority primarily for the purpose of investigating corruption in a federal benefits program.

Second, the individual supervising the officers and the daily operations of the CDI Unit here is a federal agent. Under the MOU, the OIG is in charge of all aspects of the program and all CDI Unit operations. The OIG is responsible for providing any necessary technical support and funding for all CDI Units in conjunction with SSA. OIG Special Agent Roberts is the CDI Unit's "Team Leader" and ensures that the mission of the CDI Unit is accomplished. Roberts is "the CDI Unit's final decision-making authority regarding day-to-day CDI Unit operations, subject to OIG management oversight." Therefore, as in *Askew*, Sanchez and Villasenor were subject to the immediate control and supervision of a federal officer.[5] *See Askew*, 548 F.2d at 677

grant defendants' motion to strike these briefs (Dkt. No. 62) and leave for another day the issues raised therein. We deny plaintiffs' motion to substitute a single brief (Dkt. No. 65).

[5] In reaching this conclusion, we do not consider the Declaration of Conor Washington, the Special Agent in Charge of the United States Social Security Administration's Office of the Inspector General Cooperative Disability Investigations program. Therefore, we need not address plaintiffs' argument that the district court erred in considering this declaration.

(noting that "defendants' activities were clearly directed by and subject to the immediate control of [federal] supervisors").

Third, other facts also support our conclusion that Sanchez's and Villasenor's investigations as part of the CDI Unit were under color of federal law and not state law. Sanchez and Villasenor continued to receive their paychecks from Los Angeles County while they were assigned to the CDI Unit, but the SSA reimbursed Los Angeles County for their salaries and overtime. *See id.* The investigations of Thai and Doan took place in San Diego, outside of Los Angeles County, indicating that Sanchez and Villasenor were not drawing on their authority as Los Angeles District Attorney's Office investigators. *See id.*

The federal nature of the CDI Unit is consistent with many other law enforcement programs that involve both state and federal employees whose officers have been held not liable to suit under § 1983. *See, e.g.*, *Jakuttis*, 95 F.4th at 29 (a state trooper serving as an officer for the federal Drug Enforcement Administration was not plausibly alleged to have acted under color of state law); *Yassin*, 39 F.4th at 1090 (no § 1983 action available against a local police officer working on a federal task force as a Special Deputy United States Marshal); *King*, 917 F.3d at 433–34 (no § 1983 action against state police officers assigned to a joint fugitive task force between the FBI and the City of Grand Rapids). Thus, the officers' status as Los Angeles District Attorney's Office employees or statutory peace officers does not mean that they acted under color of state law in these circumstances.

Plaintiffs provide no evidence that "the authority of the state was exerted in enforcing the law" such that the officers'

conduct is fairly attributable to the state. *Tongol*, 601 F.2d at 1097. Rather, Sanchez and Villasenor engaged in the conduct that allegedly deprived Thai and Doan of their rights while operating within a federal program, under the daily supervision and immediate control of a federal officer, and therefore acted under color of federal law. Roberts' federal supervising authority distinguishes Sanchez and Villasenor from officers of other joint federal-state agencies supervised by state employees and ultimately held to act under color of state law. *Cf. Orr*, 780 F.2d at 390–93 (holding the state action requirement for a § 1983 cause of action was met where a state officer had "administrative control" over the defendants and "made and implemented the final decision").

Thai and Doan's arguments to the contrary fail. They argue that Sanchez and Villasenor acted under color of state law due to the state DDS's referrals to the CDI Unit and the submission of the CDI Unit's reports to the DDS. We disagree. Such administrative actions do not alter the overall character of the officers' conduct. *See e.g.*, *Yassin*, 39 F.4th at 1091 n.3 ("It also does not make any difference that [defendant] worked with Minneapolis police officers. Federal and state officers work together all the time without clouding their distinct sources of authority . . . ."). Referrals, whether from the state DDS, the SSA, or elsewhere, are screened by the OIG special agent leading the CDI Unit before they are accepted and assigned. A joint federal-state endeavor, acting under its own guidelines pursuant to federal authority, does not act under color of state law merely because it accepts referrals from actors who may be state officials or otherwise operate outside of the federal government. *See King*, 917 F.3d at 433–34 (a federal program's decision to enforce a state warrant was made by virtue of federal authority so was under color of federal law);

*cf. Cabrera*, 973 F.2d at 743 ("We have not found a single precedent which would support a holding that a federal agency acting under its own guidelines could be considered to have acted 'under color of state law' merely because it was induced by the actions of a state actor to withdraw a federally financed program."). Sanchez and Villasenor would not have been assigned to the investigations of Thai and Doan if not for the CDI Unit's acceptance of those cases by OIG Special Agent Roberts. *See Yassin*, 39 F.4th at 1090–91. That the officers' reports—which were the property of the OIG—were later shared with the state DDS does not alone indicate that their investigations should be attributed to state authority.

Thai and Doan also argue that Sanchez and Villasenor were acting under color of state law because they sometimes adhered to state or local procedures during their investigations. For instance, according to Thai and Doan, Sanchez and Villasenor presented their state identification instead of federal identification, and wore visible firearms, as permitted by Los Angeles District Attorney's Office rules but prohibited by the CDI Unit's OIG Special Agent Handbook. Thai and Doan also argue that Sanchez and Villasenor were acting under color of state law because they sometimes failed to follow all the requirements of the CDI Unit's OIG Special Agent Handbook, such as failing to provide advice of rights, to obtain explicit consent for entrance into a residence or for interviewing the subject, and to provide a translator.

But Sanchez's and Villasenor's use of some state practices or imperfect implementation of federal practices does not alter the fact that they were implementing federal authority under the supervision of a federal agent. *See Askew*, 548 F.2d at 677 (holding that state officers were

acting under color of federal law despite the fact that one of the officers presented his state police badge instead of his federal credentials in gaining admission to plaintiff's home); *Yassin*, 39 F.4th at 1091 (holding that an appointed officer who introduced herself as a local police officer, used her municipal police *Miranda* form, and filed an incident report with the local police department nevertheless did not act under color of state law during a federal investigation). Those facts alone do not change our conclusion that "the totality of the circumstances surrounding the [investigations] out of which plaintiffs' [§] 1983 claim[s] arise[ ] clearly shows that [the officers] were acting pursuant to federal authority and not under color of any state law." *Askew*, 548 F.2d at 677.

\* \* \*

Accordingly, we reject Thai and Doan's argument that Sanchez and Villasenor acted under color of state law. For purposes of their summary judgment motion, Sanchez and Villasenor acted under color of federal law as a matter of law. Therefore, they are not subject to suit under § 1983. Because we also reject plaintiffs' other claims in a separate memorandum disposition, *see Thai v. County of Los Angeles*, — F. App'x — (9th Cir. 2025), the district court correctly granted defendants' motion for summary judgment.

**AFFIRMED.**